UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VERIZON COMMUNICATIONS INC., HANS VESTBERG, and MATTHEW ELLIS,<br><br>Defendants. | No. 2:23-cv-5218<br><br><br>CLASS ACTION<br><br>COMPLAINT |

Plaintiff General Retirement System of the City of Detroit ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Verizon Communications Inc. ("Verizon" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Verizon securities between October 30, 2018 and July 26, 2023, inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as at least one of the Defendants, Mathew Ellis, resides in this judicial district, Defendant Verizon maintains its Operational Headquarters with executive leadership and corporate functions in this judicial district at One Verizon Way, Basking Ridge, NJ, and the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Verizon securities during the Class Period and was economically damaged thereby.

7.      Defendant Verizon is a telecommunications company.  Verizon common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "VZ."

8.      Defendant Hans Vestberg ("Vestberg") has served as the Company's Chief Executive Officer ("CEO") since August 2018.  Defendant Vestberg is also the Chairman of the Board of Directors (the "Board").

9.      Defendant Matthew Ellis ("Ellis") served as the Company's CFO from November 2016 through May 1, 2023.

10.     Defendants Vestberg and Ellis are collectively referred to herein as the "Individual Defendants."

11.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

12.    Verizon and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

13.    During the Class Period, Defendants failed to disclose that the Company was responsible for an extensive network of lead cables that had been previously laid in many areas around the country, causing harm and posing the risk of further harm to the environment, Company employees, and surrounding communities. Defendants omitted the truth and instead materially misrepresented Verizon's efforts to upgrade its network, mitigate environmental harms, protect employees, and safeguard the communities in which it operated. When the truth was

revealed, Verizon investors suffered substantial damages under the federal securities laws.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

14.    The Class Period begins on October 30, 2018.   On that date, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2018 (the "3Q18 Form 10-Q").   Attached to the 3Q18 Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Vestberg and Ellis, attesting to the accuracy of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

15.    The 3Q18 Form 10-Q contained the following statements regarding the Company's retirement of its copper cable network and transition to updated infrastructure:

*Capital Expenditures and Investments*

***We continue to invest in our wireless network, high-speed fiber and other advanced technologies to position ourselves at the center of growth trends for the future.*** During the nine months ended September 30, 2018, these investments included $12.0 billion for capital expenditures. See "Cash Flows Used in Investing Activities" for additional information. We believe that our investments aimed at expanding our portfolio of products and services will provide our customers with an efficient, reliable infrastructure for competing in the information economy….

*We are consistently deploying new network architecture and technologies to extend our leadership in both fourth-generation (4G) and fifth-generation (5G) wireless networks.* Our Intelligent Edge Network design allows us to realize significant efficiencies by utilizing common infrastructure within the core and providing flexibility at the edge of the network to meet customer requirements. …

*Reserves have been established to cover environmental matters relating to discontinued businesses and past telecommunications activities.* These reserves include funds to address contamination at the site of a former Sylvania facility in Hicksville, NY, which had processed nuclear fuel rods in the 1950s and 1960s. In September 2005, the Army Corps of Engineers (ACE) accepted the site into its Formerly Utilized Sites Remedial Action Program. As a result, the ACE has taken primary responsibility for addressing the contamination at the site. An adjustment to the reserves may be made after a cost allocation is conducted with respect to the past and future expenses of all of the parties. Adjustments to the environmental reserve may also be made based upon the actual conditions found at other sites requiring remediation.

(Emphasis added).

16.     These statements were materially false and misleading because, at the time they were made, many of the legacy copper cables abandoned by the Company were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Company employees and the public.

17.     On February 15, 2019, the Company filed with the SEC its 2018 Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 Annual Report").  Attached to the 2018 Annual Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial

reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

18.     The 2018 Annual Report contained the following statements regarding the Company's copper cable network infrastructure:

> ***To compensate for the shrinking market for traditional copper-based products (such as voice services), we continue to build our Wireline business around a fiber-based network supporting data, video and advanced business services - areas where demand for reliable high-speed connections is growing. We continue to seek ways to increase revenue, further realize operating and capital efficiencies and maximize profitability across the segment. We are reinventing our network architecture around a common fiber platform that will support both our wireless and wireline businesses. We expect our "multi-use fiber" Intelligent Edge Network initiative will create opportunities to generate revenue from fiber-based services in our Wireline business….***

> Consumer Markets provides residential fixed connectivity solutions, including Internet, TV and voice services. We provide these services over our 100% fiber-optic network under the brand "Fios" and ***over a traditional copper-based network to customers who are not served by Fios***. In 2018, Consumer Markets revenues were $12.6 billion, representing approximately 42% of Wireline's aggregate revenues…..

> *Voice services*. ***We offer voice services on our fiber and copper networks, providing local, long distance, and calling features****….*

> *Core services.* Core services include core voice and data services, which consist of a comprehensive portfolio of domestic and global solutions utilizing traditional telecommunications technology. Voice services include local exchange, regional, long distance and toll-free calling along with voice messaging services, conferencing and contact center solutions. Core data includes private line and data access networks. Core services also include the provision of customer premises equipment, and installation, maintenance and site services. ***We continue to transition customers out of copper-based legacy voice and data services to fiber services, including IP and Ethernet.***

(Emphasis added).

19.    These statements were materially false and misleading because, at the time they were made, many of the legacy copper cables abandoned by the Company were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Company employees and the public.

20.    On February 4, 2020, Verizon issued the following Environmental, Health and Safety Policy (the "EHS Policy"):



Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. Our commitment goes beyond maintaining compliance with laws, regulations and policies. Verizon's overarching sustainability mission is to use and promote sustainable business practices that reflect our commitment to the economic, environmental, and social responsibilities we have to our employees, customers, shareowners, and society.

Verizon will conduct business in an environmentally and socially responsible manner and provide employees with a safe and healthful workplace. We are committed, through our environmental, health and safety (EHS) management system and supporting programs, to eliminate hazards and reduce EHS risks.

Verizon will provide the resources needed to meet our corporate commitments, fulfill our compliance obligations, and foster a culture of continual EHS improvement.

Verizon employees and everyone who conducts business on our behalf must perform their jobs in a safe and environmentally responsible manner and must comply with all laws, regulatory requirements, and company programs for protecting the environment and human health and safety. Verizon will seek employees' participation and consultation to identify concerns and opportunities for improvement.

Verizon will provide our customers with solutions—through our products and services—which help them improve safety performance, reduce environmental impact, and support our nation's transition to a sustainable, low-carbon economy.

All Verizon employees and those who conduct business on behalf of Verizon are responsible for following this policy. The Environment, Health and Safety organization is responsible for providing direction and support.

For more information about the scope and organization of Verizon's environmental, health and safety management system, please direct inquiries to askEHS@one.verizon.com.

Issued on 02/04/2020

21.    Certain of the statements in the EHS Policy, such as that "Verizon is committed to protecting the environment and the safety and health of its employees,

customers, and the communities where we operate.  Our commitment goes beyond maintaining compliance with laws, regulations and policies.  Verizon's overarching sustainability mission is to use and promote sustainable business practices that reflect our commitment to the economic, environmental, and social responsibilities we have to our employees, customers, shareowners, and society," were materially false and misleading because, at the time the EHS Policy was issued, Verizon was responsible for lead cables harming and posing risk of further harm to the environment, Company employees and the public.

22.     On February 21, 2020, the Company filed with the SEC its 2019 Annual Report on Form 10-K for the year ended December 31, 2019 (the "2019 Annual Report").  Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

23.     The 2019 Annual Report contained the following statements regarding the Company's copper cable network infrastructure:

> Our wireless services are provided across one of the most extensive wireless networks in the United States (U.S.) under the Verizon brand and through wholesale and other arrangements. ***Our wireline services are provided in nine states in the Mid-Atlantic and Northeastern U.S., as well as Washington D.C., over our 100% fiber-optic network under the Fios brand and over a traditional copper-based network to customers who are not served by Fios.*** In 2019, the Consumer segment's revenues were $91.1 billion, representing approximately

69% of Verizon's consolidated revenues. As of December 31, 2019, Consumer had approximately 95 million wireless retail connections, 6 million broadband connections and 4 million Fios video connections….

*Residential Fixed Services.* We provide residential fixed connectivity solutions to customers over our 100% fiber-optic network under the Fios brand, and ***over a traditional copper-based network to customers who are not served by Fios***. During 2018, we commercially launched fifth-generation (5G) wireless technology for the home (5G Home) on proprietary standards in four U.S. markets and on global standards in a fifth market in 2019.

We offer residential fixed services tailored to the needs of our customers. Depending on those needs at a particular time, our services may include features related to, among other things: Internet access at different speed tiers using fiber-optic, ***copper or wireless technology***; video services that may feature a variety of channel options, video on demand products, cloud-based services and digital video recording capabilities; over-the-top video services; and voice services.

(Emphasis added).

24.     These statements were materially false and misleading because, at the time they were made, many of the legacy copper cables abandoned by the Company were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Company employees and the public.

25.     On February 25, 2021, the Company filed with the SEC its 2020 Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report").  Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

26.     The 2020 Annual Report stated the following, in pertinent part, regarding the Company's environmental impact:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the new digital world.  During 2020, we focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions.  ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services***.  Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities.  We believe that steady and consistent investments in our networks and platforms will drive innovative products and services and fuel our growth.

(Emphasis added.)

27.     This statement was materially false and misleading because, at the time it was made, the Company was responsible for lead cables harming and posing risk of further harm to the environment, Company employees and the public.  Further, the Company's ownership of these cables, and failure to disclose their ownership of them to employees and others likely to be harmed by them, constituted a threat to the Company's reputation and ability to create business value by earning "customers', employees', and shareholders' trust."

28.     The 2020 Annual Report contained the following statement regarding worker safety:

> In 2020, Verizon employees across the Company came together in new ways in response to the health and humanitarian crisis brought on by the novel coronavirus (COVID-19) pandemic.  Soon after COVID-19 was first identified, Verizon took many broad-ranging steps to support our employees and their families so that the Company could continue providing our essential services to our customers and communities. Some of these measures included temporarily moving over 115,000 of our employees to remote work arrangements and temporarily closing nearly 70% of our Company-owned retail store locations or moving to appointment-only store access; limiting our customer-focused field operations for a period of time; ***enhancing safety protocols for employees working outside their homes***; launching a COVID-19 leave of absence policy and expanded family care assistance for employees; and providing additional compensation to employees in front line roles that could not be done from home for a period of time. In an effort to foster transparency and provide support during this unprecedented time, Verizon launched a daily live webcast with current information on the Company's actions to address the impacts of COVID-19 as well as a number of broad ranging resources for employees.  In addition, Verizon re-trained over 20,000 frontline employees to temporarily serve in other roles, such as customer service or telesales, which not only promoted the health and safety of our employees, but also provided opportunities for learning and career development.

(Emphasis added).

29.     This statement was materially false and misleading because the Company did not adequately warn or care for employees who were exposed to dangerous levels of toxic lead as a result of handling Company-owned cables that were covered in lead.

30.    On April 27, 2021, July 28, 2021, and October 26, 2021 the Company filed with the SEC its quarterly reports on Form 10-Q for the periods ended March 31, 2021, June 30, 2021, and September 30, 2021, respectively (collectively, the "2021 Quarterly Reports").  Attached to each of the 2021 Quarterly Reports were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

31.    Each of the 2021 Quarterly Reports contained the following statement, which was also included in the 2020 Annual Report:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the new digital world.  In 2021, we are focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions*.  **We are creating business value by earning customers,' employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services.**  Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities.  We believe that steady and consistent investments in our networks and platforms will drive innovative products and services and fuel our growth.

(Emphasis added.)

32.   This statement was materially false and misleading for the reasons discussed in paragraph 27.

33.   On February 11, 2022, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report").  Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

34.   The 2021 Annual Report contained the following statement:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the new digital world.  During 2021, we focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions.  ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services.***  Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities.  We believe that steady and consistent investments in our networks and platforms will drive innovative products and services and fuel our growth.

(Emphasis added).

35.     This statement was materially false and misleading for the reasons discussed in paragraph 27.

36.     On April 27, 2022, July 28, 2022, and October 25, 2022 the Company filed with the SEC its quarterly reports on Form 10-Q for the periods ended March 31, 2022, June 30, 2022, and September 30, 2022, respectively (collectively, the "2022 Quarterly Reports").  Attached to each of the 2022 Quarterly Reports were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

37.     Each of the 2022 Quarterly Reports contained the following statement:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the digital world. In 2022, we are focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services***. Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that 2022 is a peak year of capital investment for us as we are rapidly deploying C-Band spectrum, which, together with our industry leading millimeter wave deployment, 4G LTE network, fiber

infrastructure and other network deployments, will drive innovative products and services and fuel our growth.

(Emphasis added).

38.    This statement was materially false and misleading for the reasons discussed in paragraph 27.

39.    In 2022, the Company posted on its website its 2021 Environmental, Social and Governance Report for the 2021 calendar year (the "2021 ESG Report"). The 2021 ESG Report contained the following statement regarding the Company's handling of waste:

> Verizon's recycling practices exceed regulatory mandates.  We engage e-waste vendors that manage our waste in accordance with high industry standards for environmental stewardship such as R2 or e-Stewards. ***Our practice is to require lead-acid batteries from our U.S. operations to be sent to Verizon-approved recycling facilities in the U.S. or Canada and to require vendors to provide certificates of recycling for the batteries***.  We regularly audit facilities, including battery smelters, that manage Verizon's hazardous or regulated waste.

(Emphasis added).

40.    This statement was false and misleading at the time it was made because Verizon had failed to properly dispose of its legacy cable infrastructure and was responsible for lead cables harming and posing risk of further harm to the environment, Company employees and the public.

41.    On February 10, 2023, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report").  Attached to the 2022 Annual Report were certifications pursuant to SOX

- 16 -

signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

42.     The 2022 Annual Report contained the following statement regarding litigation risk:

> **We are subject to a substantial amount of litigation, which could require us to pay significant damages or settlements.**
>
> We are subject to a substantial amount of litigation and claims in arbitration, including, but not limited to, shareholder derivative suits, patent infringement lawsuits, wage and hour class actions, contract and commercial claims, ***personal injury claims, property claims, environmental claims***, and lawsuits relating to our advertising, sales, billing and collection practices***. In addition, our wireless business also faces personal injury and wrongful death lawsuits relating to alleged health effects of wireless phones or radio frequency transmitters.*** We may incur significant expenses in defending these lawsuits. In addition, we may be required to pay significant awards or settlements.

(Emphasis added).

43.     This statement was false and misleading because it omitted that Verizon also faced a heightened risk of personal injury lawsuits stemming from harm caused by its toxic lead-covered cables, which could also lead to environmental-related litigation (such as if the toxic lead seeps into a source of drinking water).

44.     The 2022 Annual Report further contained the following statement:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the digital world. In 2022, we focused on maintaining our network leadership, including by rapidly deploying C-Band spectrum; retaining and growing our

high-quality customer base while balancing profitability in challenging market conditions; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning the trust of our stakeholders, limiting our environmental impact and supporting our customer base growth while creating social benefit through our products and services***. Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. 2022 was a peak year of capital investment for us as we rapidly deployed C-Band spectrum. We believe that this spectrum, together with our industry leading millimeter wave spectrum holding, 4G LTE network and fiber infrastructure, will drive innovative products and services and fuel our growth.

(Emphasis added).

45.     This statement was materially false and misleading because, at the time it was made, the Company was responsible for lead cables harming and posing risk of further harm to the environment, Company employees and the public. Further, the Company's ownership of these cables and failure to disclose their ownership of them to employees and others likely to be harmed by them constituted a threat to the Company's reputation and ability to, as it itself stated, create business value by earning the trust of stakeholders.

46.     In 2023, Verizon released on its website its Environmental, Social and Governance Report for the 2022 calendar year (the "2022 ESG Report"). The 2022 ESG Report contained the following statement regarding Verizon's purported efforts

to reduce waste, and on responsibly disposing of potentially hazardous waste, such as lead-acid batteries:

### E-waste: reducing, reusing and recycling

Verizon defines electronic waste, or e-waste, as electronic products and component parts that are at the end of their useful life and/or have been returned by customers.  E-waste generated by our business operations includes cell phones, chargers, set-top boxes, network equipment, batteries and associated plastic components*.  **In 2022, Verizon reused or recycled approximately 43.4 million pounds of e-waste, including 1.6 million pounds of plastic and 2.7 million pounds of lead-acid batteries**.

We strive to divert 100% of e-waste from landfills by reusing or responsibly recycling materials.  To the extent practicable, we reuse electronic products and parts internally.  When internal reuse is not possible, we market these materials for reuse through approved vendors or work with partners to responsibly recycle them.  Verizon's Circular Supply Chain team partners with Corporate Sourcing to incorporate terms into our vendor contracts for the responsible end-of-life management of our products.

Verizon's device trade-in program supports our efforts to repurpose, reuse or recycle all of the devices and accessories that we receive back from consumers.  The program lets both Verizon and non-Verizon consumers return qualifying, pre-owned mobile and other electronic devices in exchange for a Verizon credit or gift card.  Consumers can also return obsolete devices for recycling.  In addition, we refurbish and redistribute to customers our home internet devices for 4G and 5G fixed wireless access and Fios service.

Many of Verizon's recycling practices exceed regulatory mandates.  We engage e-waste vendors that manage our waste in accordance with high industry standards for environmental stewardship such as R2 and e-Stewards.  ***Our practice is to require lead- acid batteries from our U.S. operations to be sent to Verizon-approved recycling facilities in the U.S. or Canada and to require our vendors to provide certificates of recycling for the batteries.  We regularly audit facilities, including***

- 19 -

**battery smelters, that manage Verizon's hazardous or regulated waste**.

(Emphasis added).

47.    This statement was false and misleading at the time it was made because Verizon was responsible for lead cables harming and posing risk of further harm to the environment, Company employees and the public.

48.    On April 27, 2023, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2023 (the "1Q23 Report").  Attached to the 1Q23 Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

49.    The 1Q23 Report contained the following statement:

To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the digital world. In 2023, we are focused on maintaining the reliability and resilience of our network, retaining and growing our high-quality customer base while balancing profitability in challenging market conditions, and driving monetization of our networks, platforms and solutions. *We are creating business value by earning the trust of our stakeholders, limiting our environmental impact and supporting our customer base growth while creating social benefit through our products and services*.    Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology

systems and data system capabilities.  We believe that our C-Band spectrum, together with our industry leading millimeter wave spectrum holding, fourth-generation (4G) Long-Term Evolution (LTE) network and fiber infrastructure, will drive innovative products and services and fuel our growth.

(Emphasis added).

50.    This statement was materially false and misleading for the reasons discussed in paragraph 27.

51.    The statements contained in ¶¶14-50 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and misleading statements and failed to disclose that: (1) Verizon was responsible for cables around the country that are highly toxic due to their being wrapped in lead, a known neurotoxin, which has harmed and posed the risk of further harming the environment, exposed Company employees, and the general public; (2) Verizon faces potentially significant litigation risk, regulatory risk, and reputational harm as a result of its responsibility for these lead-covered cables and the health risks stemming from their presence around the United States; (3) Verizon was warned about the damage and risks presented by these cables but did not disclose them as a potential threat to employee safety or to everyday people and communities; and (4) as a result, Defendants' statements about Verizon's business, operations, and

prospects, were materially false and misleading and/or lacked a reasonable basis in fact at all relevant times.

## THE TRUTH BEGINS TO EMERGE

52.    On Sunday, July 9, 2023, *The Wall Street Journal* released an article entitled "America is wrapped in miles of toxic lead cables."  It stated, in pertinent part:

> [. . .] Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a Wall Street Journal investigation found.  As the lead degrades, it is ending up in places where Americans live, work and play.
>
> The lead can be found on the banks of the Mississippi River in Louisiana, the Detroit River in Michigan, the Willamette River in Oregon and the Passaic River in New Jersey, according to the Journal's tests of samples from nearly 130 underwater-cable sites, conducted by several independent laboratories.  The metal has tainted the soil at a popular fishing spot in New Iberia, La., at a playground in Wappingers Falls, N.Y., and in front of a school in suburban New Jersey.
>
> The U.S. has spent decades eradicating lead from well-known sources such as paint, gasoline and pipes.  The Journal's investigation reveals a hidden source of contamination – more than 2,000 lead-covered cables – that hasn't been addressed by the companies or environmental regulators.  These relics of the old Bell System's regional telephone network, and their impact on the environment, haven't been previously reported.
>
> Lead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency.  At the New Iberia fishing spot, lead leaching into the sediment near a cable in June 2022 measured 14.5 times the EPA threshold for areas where children play.  "We've been fishing here since we were kids," said Tyrin Jones, 27 years old, who grew up a few blocks away.

For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees.  They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.

Doctors say that no amount of contact with lead is safe, whether ingested or inhaled, particularly for children's physical and mental development.  Even without further exposure, lead can stay in the blood for about two or three months, and be stored in bones and organs longer.  Risks include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults, according to U.S. health agencies.

The Journal's findings "suggest there is a significant problem from these buried lead cables everywhere, and it's going to be everywhere and you're not even going to know where it is in a lot of places," said Linda Birnbaum, a former EPA official and director of the National Institute of Environmental Health Sciences, a federal agency.

***In Coal Center, Pa., medical tests independently sought by the mother of 6-year-old twins, Joyanna and Beau Bibby, and shared with the Journal, showed they had high levels of lead in their blood.  The tests were taken a few days after they played in a lot next to their house under a drooping cable.***

In response to the Journal's reporting, [. . .] Verizon and other telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes.  They said they follow regulatory safety guidelines for workers dealing with lead.

The companies and an industry group representing them said they would work together to address any concerns related to lead-sheathed cables.  "The U.S. telecommunications industry stands ready to engage constructively on this issue," said a spokeswoman for USTelecom, a broadband association that represents companies in the industry.

*       *       *

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination.  It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

Some former telecom executives said companies believed it was safer at times to leave lead cables in place than remove them, given the lead that could be released in the process.

The lead-covered cable network included more than 1,750 underwater cables, according to public records collected by the Journal.  A Journal analysis of the five most densely populated states, and more than a dozen of the most densely populated counties in the nation, identified about 250 aerial cables alongside streets and fields next to schools and bus stops, some drooping under the weight.  There are likely far more throughout the country.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites.  The samples were analyzed for lead content by Pace Analytical Services, an accredited environmental-testing lab.  A researcher at the University of Washington who analyzed the chemical fingerprint of lead at some of those sites verified that the lead contaminating the water and soil likely originated from the cable.

**AMONG THE FINDINGS**

—***Roughly 330 of the total number of underwater cable locations identified by the Journal are in a "source water protection area*,**" designated by federal regulators as contributing to the drinking-water supply, according to an EPA review performed for the Journal.

—Aerial lead cabling runs alongside more than 100 schools with about 48,000 students in total.  More than 1,000 schools and child-care centers sit within half a mile of an underwater lead cable, according to a Journal analysis using data from research firm MCH Strategic Data.

—In New Jersey alone, more than 350 bus stops are next to or beneath aerial lead-covered cables, a Journal analysis of NJ Transit data found.

—Roughly 80% of sediment samples taken next to underwater cables, which the Journal tested, showed elevated levels of lead.  It isn't known if the level of leaching is constant; experts say old cables tend to degrade over time.

Ben **Grumbles, executive director of an association of state environmental regulators, called the Journal's findings disturbing. "This is a type of toxic exposure that isn't on the national radar and it needs to be," he said.  "There is a need to act and clean it up."**

## AN ANCIENT NETWORK

American Telephone & Telegraph laid nearly all the cables in question between the late 1800s and the 1960s as it built out telephone service across the U.S.  The cables, often containing hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water.  For underwater cables, steel cords sometimes surround the lead for further protection.

When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place.

With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon. Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances denied their ownership.  The Journal provided lists of cable locations to major telecom providers, which declined to detail cable locations.

To track the underwater cables, the Journal collected more than 40,000 pages of records from federal and state government offices, including applications to the U.S. Army Corps of Engineers to install the cables that were approved more than a century ago.  **Removing Army Corps-approved cables at any time would routinely require a permit or be noted in the original paperwork, officials say.  The Journal tally of abandoned lead cables is sure to be an undercount**.

Researchers Seth Jones and Monique Rydel Fortner, from the environmental consulting firm Marine Taxonomic Services, collected lead, soil and water samples at the Journal's request—a process that included diving expeditions at some locations.  They have become

experts in lead cables since they discovered them under Lake Tahoe more than 10 years ago and have advocated for their removal. The Environmental Defense Fund, a nonprofit advocacy group, provided guidance and $85,000 to MTS to partly fund its field research for the project.

The Journal found that where lead contamination was present, the amount measured in the soil was highest directly under or next to the cables, and dropped within a few feet—a sign the lead was coming from the cable, experts said.

The Journal didn't find lead in all the locations it tested. The level of contamination can vary in water and soil, depending on environmental and other factors.

The most obvious public-health risks from lead contamination remain from well-known sources such as lead paint, leaded gasoline and lead piping that brings drinking water to homes. The EPA and other agencies have spent billions of dollars to reduce lead in the environment. In 1997, health regulators said average blood lead levels in children and adults had dropped more than 80% since the 1970s.

Yet large numbers of American children continue to show levels of lead in their blood— more than half of those tested, according to a Quest Diagnostics study published in 2021, based on an analysis of test results from more than one million children under age 6.

"A new, uncontrolled source of lead like old telephone cables may partly explain" why children continue to have lead in their blood, said Jack Caravanos, an environmental public-health professor at New York University, who assisted the Journal in its research. "We never knew about it so we never acted on it, unlike lead in paint and pipes."

Gordon Binkhorst, an environmental consultant and expert on lead sampling, said he believes cables should be removed because they are "continuing sources of soil and potentially groundwater contamination." Other experts said covering the cables and the area around them could reduce the risk.

Binkhorst reviewed the sampling methods used by the Journal and said they were appropriate techniques for basic testing of whether lead was

present in the soil and water near the cables, using a certified environmental testing lab.

\*        \*        \*

In Wappingers Falls, N.Y., about 60 miles north of New York City just off the Hudson River, an aerial lead cable hangs above the perimeter of a town playground, with a jungle gym, a swing set and a basketball court.

Near a "CHILDREN AT PLAY" sign, lead in the soil measured more than 1,000 parts per million, according to Caravanos, the NYU professor.

The EPA's recommendations for the levels of lead it believes are generally safe in soil are lower for areas where children play, at 400 parts per million, and higher for other areas, at 1,200 parts per million. (While lead in water is described in parts per billion, lead in soil is described in parts per million, with one part per million equivalent to about one inch in 16 miles.)

Caravanos used an X-ray fluorescence analyzer, or XRF, a device used by scientists to measure elements in soil.  At the corner of the playground, the XRF showed lead in soil just under the cable at 850 parts per million.

It doesn't take much lead in soil to elevate a blood level for a child, said Caravanos.  "You just need a little dirt on your fingers to put into your mouth and ingest, and you get an elevated blood lead above the CDC level of 3.5."

In West Orange, N.J., a lead-sheathed cable sags over tree-lined sidewalks and driveways for more than one-third of a mile, where children and their parents walk, across the street from Gregory Elementary School.  The cable sometimes dips to about 12 feet above the ground.

Caravanos found contaminated soil beneath the cable in multiple spots and registered multiple readings far exceeding the EPA guideline for play areas.  Gregory Elementary School is one of 64 schools in New Jersey where the Journal identified aerial lead cables.

\*     \*     \*

**FINGERPRINTING LEAD**

At selected sites, the Journal took the extra step to confirm that lead stemmed from the cables and not another source.  Reporters worked with a researcher to perform an isotopic analysis, a procedure that determines a specific fingerprint for the lead involved.  The testing by Bruce Nelson, a geochemistry professor at the University of Washington who specializes in the field, linked the lead found in samples most likely to the specific cables—as opposed to, say, lead from a factory or from paint.

\*     \*     \*

At some cable sites, telecom companies disavowed ownership.  In Lake Pend Oreille in the Idaho panhandle, a snarl of two lead-covered cables lies abandoned at a spot where children speed by on inner tubes in the summer.  The cables sit under a railroad bridge in a prime fishing spot.

A sample of water collected in August at the lake bottom showed lead at 1,250 parts per billion.  A water sample taken at the surface in that spot showed lead at 38.8 parts per billion.  An isotopic analysis showed that the fingerprint of the lead in the water at the surface matched lead from a telecom cable at that site, and not that of a lakeside slag heap known as Black Rock, the detritus of a lead smelter that had ceased operations by 1913.

A predecessor company to Verizon laid a cable near the site, a U.S. Army Corps record shows.  Verizon, Frontier Communications and Ziply Fiber, telecom companies that have variously served this region over the years, say they don't own the cables.

**COAL COUNTRY RISK**

*In Coal Center, Pa., an aerial lead-sheathed cable runs along the street, drooping so low in certain spots that it is nearly within arm's reach.  The roughly mile-long cable, from Verizon, runs into neighboring California, Pa., across an entrance to apartment buildings, and near a school bus stop and playground. Some local residents had known about the cable and had been voicing their concerns for nearly a year*.

*Lead found at one of the locations measured 7.5 times the amount the EPA says is safe for play areas, according to a soil sample collected by the Journal. The isotopic analysis by Nelson showed the lead in the soil mirrored the lead from the cable and was unlike the background lead in that area.*

The lead-sheathed cable runs over the property of Shannon Bibby, 36, mother of the 6- year-old twins. This February, her children played under the cable in the lot next to their house, where ground was being dug up for the foundation of a home. *An analysis of soil collected by the Journal from the family's property showed lead at a level more than 40% higher than the recommended level for play areas by the EPA*.

*A borough council member, Bibby had her children's blood tested after learning about the Journal's finding. Capillary tests, or blood pricks, found lead in one child's blood higher than 3.5 micrograms per deciliter. The other child hit that mark, which is the level at which the CDC recommends seeking medical or environmental follow-up. A subsequent blood test showed non-detectable levels of lead.*

It is impossible to say if the twins' initial elevated lead level tests were directly linked to exposure from the cable. The Bibbys' results were below what the EPA model could expect to find in a child playing in soil with the concentrations found at their property, according to Caravanos.

*Bibby said she and other Coal Center residents have been pushing Verizon to take the cable down. Verizon has told them it has working services on the old lead cable. In December, she and other Coal Center borough council members discussed their concerns in the tiny borough hall at the edge of the Monongahela River.*

*"We have to get moving on these cables," said council member Rob Lincavage, who grew up in Coal Center and said it has become one of his goals in life to see the cable removed.*

*"It shouldn't be here," said Bibby. She said the lead should be removed "before something bad happens."*

53.     On this news, Verizon's stock fell $0.76 per share, or 2.1% to close at

$35.14 per share on July 10, 2023, on unusually heavy trading volume, damaging

investors.

54.     On July 12, 2023, *The Wall Street Journal* released a follow-up article

entitled "What AT&T and Verizon knew about toxic lead cables." The article stated,

in pertinent part:

> [. . .] For decades, [Verizon and other firms] dating back to the old Bell
> System have known that the lead in their networks was a possible health
> risk to their workers and had the potential to leach into the nearby
> environment, according to documents and interviews with former
> employees.
>
> They knew their employees working with lead regularly had high
> amounts of the metal in their blood, studies from the 1970s and '80s
> show. [. . .] Government agencies have conducted inspections,
> prompted by worker complaints, that led to citations for violations
> involving lead exposure and other hazardous materials more than a
> dozen times over four decades, records show.
>
> *          *          *
>
> **Yet the companies haven't meaningfully acted on potential health
> risks to the surrounding communities or made efforts to monitor the
> cables, according to historical data, documents and interviews with
> former executives, safety managers and workers who handled lead.
> The telecom industry's lead-covered cables have been largely
> unknown to the public.  The industry doesn't have a program to
> remove or assess their condition.  Four former Federal
> Communications Commission chairs said they weren't aware of lead
> in phone networks.**
>
> *          *          *
>
> "They knew the risks, but they didn't want to do a lot to mitigate it,"
> said James Winn, who worked as a cable splicer among other jobs for

several Bell System companies for 45 years.  Company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after, he said.

A Wall Street Journal investigation has revealed that telecom companies left behind more than 2,000 potentially dangerous lead-covered cables under water, in soil and overhead.  Many more are likely to exist.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites.  Roughly 80% of sediment samples taken next to underwater cables showed elevated levels of lead.

Doctors say that no amount of lead is safe, whether ingested or inhaled, particularly for children's physical and mental development.  Without further exposure, lead stays in the blood for only about two or three months, but it can be stored in organs longer and in bones even for decades, according to Dr. Philip Landrigan, director of the program for global public health and the common good at Boston College.

Like asbestos, lead must either be sealed away or removed completely to eliminate the risks.  USTelecom, a trade group that represents companies in the industry, said "the scientific literature and available studies" on lead-sheathed cables show they aren't a public-health issue or a risk to workers when precautions are used.

The group declined to provide or describe any such studies and literature.

*     *     *

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination.  It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

The cables were laid by the original American Telephone & Telegraph, also known as the Bell System, which operated as a group of regional telephone companies starting in the late 1800s.  With the breakup of the

Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon.

Some lead experts say the cables should be removed, and any contaminated soil should be taken to an appropriate landfill. Removing a lead-sheathed cable could release lead into the environment during the process but some experts say leaving the lead could result in decades-long contamination.

Other experts say less-drastic measures could decrease the risk of contamination, such as covering areas where the cables are exposed. Removing underwater cables would be a far more complicated and costly process that could require an assessment of the risk of disturbing the lead.

Telecommunications companies have wrestled with how to handle the cables. Malone's 2010 presentation noted that removing the cables that were underground wasn't easy. "Extraction of cable from underground duct can release unexpected high levels of lead dust," the presentation said. "Underground cable presents real possibilities for overexposure" to workers removing them.

The oldest cables are typically at the bottom of a manhole or conduit, said retired AT&T executive Bill Smith. Cables from the 1920s could be nearly impossible to pull out, he said. "In the underground, unless you really needed the conduit duct…you would leave it in place," he said.

*     *     *

The question of who might be responsible for any cleanup is complicated, said Brian Berkey, an associate professor of legal studies and business ethics at the University of Pennsylvania's Wharton School. When the cables were installed, if they were a reasonable and responsible decision, and considered safe at the time, the cleanup could ethically be a collective responsibility involving companies and the government, he said.

**LEAD ROOTS**

After the invention of the telephone in the 1870s, the first lines to go up were single-line connections strung on poles, connecting one point to another. Tangles of wires soon filled city skies. In the late 19th century, companies began using cables containing bundles of wires that delivered more capacity and better transmission. Sheathing the cable in lead cut electromagnetic noise in the wires and kept water out. By 1940, the majority of the phone network was in lead-covered cables.

There were signs at the dawn of the industry that lead could harm workers. Alice Hamilton, a pioneer of modern industrial medicine and the first female faculty member at Harvard University, included telephone workers among those facing risks from lead in her 1925 book "Industrial Poisons in the United States."

By 1956, the Bell System was using around 100 million pounds of lead a year, according to a Bell document. That's heavier than more than 6,660 male African elephants.

The industry began to deploy more cables that used plastics and alternative metals instead of lead over roughly the next decade, and moved away from installing new lead cables completely, as technology improved. Workers still maintained the old cables using molten lead and, at times, removed them.

In the 1970s, the U.S. began restricting lead in gasoline and banned lead-based paint in residential homes. The Occupational Safety and Health Administration drafted its first standards on worker exposure to lead and other hazards.

Bell Laboratories, the Bell System's technology and science engine, was a leader in lead research in the 1970s and invented a device that could screen for lead exposure from a drop of blood.

A 1977 Bell study provided a snapshot of high lead levels among female lead-soldering workers at Western Electric, then the manufacturing arm of the Bell System. Based on testing, it estimated that the workers had blood-lead levels in the range of 24 to 45 micrograms per deciliter. Those levels were as high as triple the average level of the population at the time. Bell scientists concluded the workers were "not being exposed to a lead hazard" because a

control group of Western Electric office workers also had high estimated lead levels.

Blood tests showed high lead levels in another group of workers—cable splicers, who fixed and maintained cables.  A 1978 letter between Communications Workers of America union officials said that AT&T "has confirmed that cable splicers may be exposed to a lead hazard," and that the company "is anxious to test splicers that may have been or are exposed to overdoses of lead."

The average lead levels in the blood of 90 cable splicers was more than 27 micrograms per deciliter, and 29% reported central nervous system symptoms, according to a 1980 paper by Mount Sinai, Bell Labs and New York City's health department.

While regulations and lead bans drove down exposure across the population, there were still more than 40,000 telecom employees working with lead in 1983, according to a Bell System document.  Even though companies stopped deploying new lead-sheathed cables in the 1960s, the existing network still needed to be maintained, and lead-based solder has remained in use.

**SMELTING HEADACHES**

\*       \*       \*

*Between 2007 and 2016, blood-lead test results for 208 Verizon workers showed that 85, or more than 40%, had levels above 3.5 micrograms per deciliter, according to Verizon data shared with the union.  That's the current level at which the Centers for Disease Control and Prevention recommends seeking medical or environmental follow-up.*

*Rob Prokopowicz, who retired from Verizon in 2021 after 40 years of working with lead, said he raised concerns with managers about routinely pumping out water from manholes that was potentially contaminated with lead, including in front of schools.  He said they told him, "If you don't feel safe, we'll send someone else."*

"When the manholes fill with rainwater and runoff, all the water we are pumping out is contaminated with lead dust," said Prokopowicz, 62.

"For the small percentage of our workforce that may need to work around lead-sheathed cable, we have a robust safety and health program to provide training, materials and resources needed to do so safely," a Verizon spokesman said.  The company said its work practices on such cables are based on the available science, legal requirements and guidance from medical and work-safety organizations.

"Verizon's long standing policy allows for any employee who requests to be tested for lead exposure to do so at any time and without any cost to the employee," he said.

A study last year at Mount Sinai of 20 Verizon workers, with an average tenure of 23 years, showed that 60% had measurable lead in their tibias, said Dr. Rabeea Khan, the study's principal investigator.  "The fact that we can detect it in your bones suggests you have had long-term exposure," she said.

Nearly half of the workers in the study, mostly cable splicers, showed lead concentrations of 10 micrograms per gram of bone, indicating increased risk of neurological or biological problems, Khan said. Mount Sinai is planning a broader study later this year.

\*     \*     \*

In response to the Journal's reporting, AT&T, Verizon and a group representing the broader telecom industry said they would work together to address any concerns or issues related to lead-sheathed cables.

(Emphasis added).

55.     On July 14, 2023, *The Wall Street Journal* released an article entitled 'I Was Really Sick, and I Didn't Know From What."  The article stated, in pertinent part:

Tracy Fitchhorn worked with lead solder.  Her husband, Dan Fitchhorn, spliced lead cables.  Her father, Peter Hopkins, handled lead as an installer and repairman.   All worked for decades for telecom companies. All are now sick.

The Fitchhorns, like tens of thousands of workers at American Telephone & Telegraph and its successor companies, were exposed to lead on the job over many years.  Current and former workers say they often felt left in the dark about their exposure and how to stay safe.

Some of the workers have neurological disorders, kidney ailments, gastrointestinal issues and cardiovascular problems, illnesses that can be linked to lead exposure.  There's no way to determine what triggered specific ailments.  Doctors say no amount of lead is safe.

The lead, which those workers handled for decades, is a potential health risk for communities across the U.S.  The cables sheathed in the toxic metal are the subject of a Wall Street Journal investigation that has detailed how AT&T, Verizon and other telecom giants left behind a sprawling network of cables, many of which are leaching lead into the environment.  Children are especially vulnerable to the effects of lead exposure.

[. . .] Verizon said it has "a robust safety and health program to provide training, materials and resources," and that workers can get lead testing at any time at no cost.

Current and former workers described scant precautions.  Many said they learned how to handle lead on the job and weren't given respirators or regular blood lead tests.

Over decades, they wiped hot lead solder to repair cables in New York, fixed aerial lead cables in Pottsville, Pa., and used shaving cream to contain manhole lead dust in Portland, Ore. James Innes said his taste changed, which can be a sign of lead exposure.

The old Bell System of phone companies had an embedded medical team, with medical directors and nurses who took blood tests at physicals for workers. They kept detailed medical records. [. . .]

***A study conducted in the 1970s at New York's Mount Sinai hospital of 90 Bell System cable splicers showed "a high lead content in their blood," with 10 "in danger of suffering medical and/or physical deterioration if they continue on their jobs," according to letters among union officials. A small study last year of lead in Verizon workers' bones showed that exposures continued.***

AT&T and Verizon declined to comment on the studies.

*Tommy Steed removed lead underground cables in the Bronx in the 1980s and said he often vomited after eating breakfast. He said he never got his blood test results from Nynex, now part of Verizon, despite repeated requests.* The state health department later provided them, showing high levels of lead. Nynex "didn't try to get me any remedial help," said Steed, now chairman of the Association of BellTel Retirees, which advocates for former workers.

56.     The article profiled Tom Killeen, a former cable splicer for, among other companies, Verizon. The article stated "Killeen has chronic headaches, memory loss and difficulty breathing. His first wife had two miscarriages. His daughter suffered from childhood heart problems and has been diagnosed with ADHD. Those conditions can be linked to lead exposure. Mr. Killeen stated, '*I was coming home every day and holding the baby, not thinking there is lead dust all over you*.'" (Emphasis added).

57.     The article also profiled Tommy Steed, a former cable splicer and lineman for, among other companies, Verizon. The article stated that "Steed's blood-lead level was 43 micrograms per deciliter in May 1988 and 39 micrograms two months later, according to New York Health department records. The average level for the U.S. population at the time was 2.8 micrograms per deciliter, according to the Centers for Disease Control and prevention." According to the article, Mr. Steed stated *"[a]t the height of my lead poisoning, I was really sick, and I didn't know from what."* (Emphasis added).

58.    Finally, the article profiled James Innes, a former cable splicer for, among other companies, Verizon. Mr. Innes was reported as having "[d]ecades of gastrointestinal problems," and was quoted as saying ***"[y]ou were creating a kind of powder from shaving the lead sheath, and every now and then you'd get a sweet taste in your mouth from inhaling the lead."*** (Emphasis added).

59.    On this news, the price of Verizon stock declined by $0.63 per share, or 1.8%, to close at $34.01 on July 14, 2023.

60.    On July 17, 2023, *The Wall Street Journal* released an article entitled "Environmental Groups Ask EPA to Shield Public From Abandoned Lead Cables." The article stated, in pertinent part:

> Three environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies.
>
> In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground. The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.
>
> A Wall Street Journal investigation revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing showed that dozens of spots registered lead levels exceeding EPA safety guidelines.
>
> "Without EPA intervention, we expect that the risk posed by the cables will increase as they further deteriorate and release lead into the environment," according to the letter by the three nonprofit

organizations, the Environmental Defense Fund, Clean Water Action and Below the Blue.

The Journal used testing including isotopic analyses and control sampling to confirm that the contaminating lead in some locations most likely came from the cables. Below the Blue's co-founders, who also work at Marine Taxonomic Services, helped the Journal with environmental sampling for its investigation. The Environmental Defense Fund provided guidance and $85,000 to Marine Taxonomic Services to partly fund its field research for the project.

The EPA and its administrator, Michael S. Regan, didn't immediately respond to a request for comment.

The Journal found lead leaching into soil directly underneath aerial lead cables, according to test results by independent accredited laboratories. The Journal identified about 250 aerial lead cables alongside streets and fields next to schools and bus stops. There are likely far more throughout the country.

"If still in use, they should be protected to prevent leaching and abrasion from the weather, marked as lead-sheathed, and taken out of service as soon as possible, followed by removal," according to the letter, which was viewed by the Journal. "EPA should also ensure surface soil contaminated by the aerial cables is removed or permanently covered."

Roughly 330 underwater cable locations identified by the Journal are in a "source water protection area," according to an EPA review performed for the Journal.

The groups appealed to Regan to use the agency's authority under the "Superfund" law and the Safe Drinking Water Act to investigate the findings.

In response to the Journal's reporting, AT&T, Verizon and USTelecom, an industry group, said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead. They declined to provide a full accounting of the number of lead cables in their networks to the Journal. They said they would work together to address any concerns related to lead cables.

Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases. The Safe Drinking Water Act allows the agency to take actions to protect health when informed of a contaminant "which is present in or is likely to enter a public water system or an underground source of drinking water" and may present "an imminent and substantial endangerment" to health.

Lead from cables and from junction boxes where cables are spliced is "accessible to the public from the ground with many near playgrounds, schools, child-care facilities, and greenways where inquisitive children may be exposed," the letter said.

Following the Journal investigation, a Wall Street analyst estimated it could cost $59 billion to remove all the lead cables nationwide.

Noting the EPA's limited resources, the groups urged the agency to tap telecom companies responsible for the most lead cables "to support the assessment and actions needed to protect the public from potential exposure."

In a congressional hearing on Thursday, Rep. Patrick Ryan called on the EPA to compel a cleanup of any contamination caused by the cables. In the hearing, the New York Democrat cited a playground where the Journal found a lead cable leaching in Wappingers Falls, N.Y., which is in Ryan's district.

"Does the EPA plan on compelling clean up action from these telecom companies?" Ryan asked Radhika Fox, assistant administrator for the EPA's Office of Water.

Fox said the EPA is looking carefully at the information in the Journal articles and is "coordinating with the FCC [Federal Communications Commission] on this so we are happy to follow up in the coming weeks."

61.    On this news, the price of Verizon stock declined by $2.55 per share, or 7.5%, to close at $31.46 per share.

62.     Between July 7, 2023 (the last trading day before *The Wall Street Journal* exposé on lead cables was first published) and the close of trading on July 17, 2023, the price of Verizon shares fell 12.3%.

63.     On July 26, 2023, *The Wall Street Journal* released an article entitled "Justice Department and EPA Probe Telecom Companies Over Lead Cables." The article stated, in pertinent part:

> The Justice Department and Environmental Protection Agency are investigating the potential health and environmental risks stemming from a sprawling network of toxic lead- sheathed telecom cables across the U.S.

> The Justice Department's civil inquiry, by the U.S. attorney's office for the Southern District of New York, is in preliminary stages and focuses partly on whether telecom companies had knowledge of the potential risks to their workers and future environmental impact when they left behind the lead cables, according to a person familiar with the inquiry.

> The EPA's enforcement office, using the agency's authority under the "Superfund" law, on Wednesday directed [Verizon] to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure within 10 days. Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.

> A Wall Street Journal investigation recently revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing near such cables showed that dozens of spots registered lead levels exceeding EPA safety guidelines.

> The EPA takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution," the agency said in a statement.

\*     \*     \*

Verizon said it hasn't been contacted by the Justice Department. A Verizon spokesman said: "As we have said from the beginning, we remain committed to the factual and scientific based analysis of the issues. We will continue to have a proactive and constructive dialogue with the EPA as we jointly work to better understand the facts and consider any potential actions."

\*     \*     \*

The EPA sought data from Verizon on three lead-sheathed cable sites, and said it would begin independent sampling in Coal Center, Pa., and West Orange, N.J., and coordinate with New York state to review samples in Wappingers Falls, N.Y., all locations cited in the Journal articles.

The EPA said a priority would be "evaluating areas with vulnerable communities and sites closely linked with children, such as schools and playgrounds." The EPA said its Office of Land and Emergency Management and regional offices are coordinating with state environmental agencies to assess potential contamination at the sites identified by the Journal.

\*     \*     \*

[. . .] Current and former workers at telecom companies stemming from Ma Bell said they learned lead work on the job and didn't receive respirators or regular blood testing, the Journal has reported.

In response to the Journal's reporting, AT&T, Verizon and USTelecom, an industry group, have said they don't believe cables in their ownership are a public-health hazard or a major contributor to environmental lead. They said they follow regulatory safety standards for workers dealing with lead.

In a statement Wednesday, USTelecom said the industry "prioritizes the health and safety of our communities and workers" and continues to "engage with policymakers on this important matter."

\*     \*     \*

On Tuesday, Verizon Chief Financial Officer Tony Skiadas said in an earnings call that "it's far too soon" to project the financial impact that aging lead-sheathed cables might have on the telecom giant. Verizon said lead-clad cable makes up a small percentage of the less than 540,000 miles of cables in its copper-wire network, though that accounting excludes two previously acquired companies with records the company is still reviewing.

Wall Street research analysts have estimated that lead cables make up roughly 15% to 20% of Verizon's legacy footprint, totaling at least 81,000 miles of lead.

Last week, Gov. Kathy Hochul directed three state departments to "immediately investigate" lead cabling in New York, directing telecom providers to provide an inventory of all lead cable locations in the state. Hochul also directed state inspectors to conduct sampling for lead in the Wappingers Falls playground where a lead cable and contamination were identified by the Journal.

"We will hold the telecommunication companies responsible and take swift action to remediate any problems," Hochul said in a statement.

Rep. Pat Ryan, a New York Democrat, wrote to Verizon, AT&T and USTelecom demanding they remove the lead cables. He also asked the companies how many miles of lead-sheathed cables they are responsible for, and about any plans to protect workers, provide access to blood and bone testing for lead, and remediate any risk.

The Manhattan U.S. attorney's office in recent years has brought a series of civil cases related to alleged environmental wrongdoing. In 2021, the office announced a settlement with Toyota Motor, in which the company paid a $180 million civil penalty for failing to comply with Clean Air Act reporting requirements. The company acknowledged that for a decade it either failed to file required emissions reports or filed them late.

64.     On this news, the price of Verizon stock declined by $0.79 per share, or 2.3%, to close at $33.55 per share on July 27, 2023.

- 43 -

65.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Verizon securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

67.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

68.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

69.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

70.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

> - whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

72.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

> - the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;
>
> - as a public issuer, the Company filed public reports;
>
> - the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
>
> - the Company's securities were liquid and traded with significant volume during the Class Period; and
>
> - the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

73.     Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly

available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

74.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

75.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.    This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

77.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading.

78.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

79.     Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in, the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary

information concerning the Company, participated in the fraudulent scheme alleged herein.

80.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel to members of the investing public, including Plaintiff and the Class.

81.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

82.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information

which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

83.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

84.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against All Defendants

85.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

87.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's

financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

88.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they culpably participated in the unlawful conduct alleged, which artificially inflated the market price of Company securities.

89.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

90.     Verizon controlled the Individual Defendants and all of its employees and culpably participated in the fraudulent scheme as alleged herein.  By reason of this conduct, Verizon is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Individual Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  August 18, 2023               ABRAHAM, FRUCHTER
                                                          & TWERSKY, LLP
                                                      LAWRENCE D. LEVIT
                                                      JACK G. FRUCHTER
                                                      MITCHELL M.Z. TWERKSY
                                                      ATARA TWERSKY


                                                      _____
                                                          s/ Lawrence D. Levit
                                                      LAWRENCE D. LEVIT

450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone: (212) 279-5050
[Fax No.] (212) 279-3655
mtwersky@aftlaw.com
jfruchter@aftlaw.com
atwersky@aftlaw.com
llevit@aftlaw.com

*Attorneys for Plaintiff*

VANOVERBEKE, MICHAUD
   & TIMMONY, P.C.
MICHAEL VANOVERBEKE
79 Alfred Street
Detroit, MI 48201
TEL: (313) 578-1200
FAX: (313) 578-1201
mvanoverbeke@vmtlaw.com

*Additional Counsel for Plaintiff*

**CERTIFICATION OF PLAINTIFF**
**PURSUANT TO THE FEDERAL SECURITIES LAWS**

I, David Cetlinski, as Executive Director of the General Retirement System of the City of Detroit ("Detroit GRS"), having the authority to enter into and execute this Certification on behalf of Detroit GRS, hereby certify as follows:

1.      I have reviewed the complaint against Verizon Communications, Inc. prepared by counsel in the above-captioned case and have authorized its filing and a motion for Detroit GRS's appointment as lead plaintiff.

2.      Detroit GRS did not engage in transactions of the Verizon Communications, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934 (the "1934 Act").

3.      Detroit GRS is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      Detroit GRS's transactions during the relevant period in the Verizon Communications, Inc. securities that are the subject of this action are set forth in the attached Schedule A.

5.      During the three-year period preceding the date of this Certification, Detroit GRS has sought to serve as a representative party on behalf of a class in the following cases filed under the 1934 Act: *Allegheny County Employees Retirement System v. Energy Transfer LP et al.*, No. 2:20-cv-00200-GAM (E.D. Pa.); *In re Allergan PLC Sec. Litig.*, No. 18 CIV. 12089 (CM) (GWG) (S.D.N.Y.); *City of Fort Lauderdale Police and Firefighters Retirement System v. Pegasystems Inc., et al.*, No. 1:22-cv-11220-WGY (D. Mass.); and *Rammohan v. Stanley Black & Decker, Inc.*, No. 3:23-cv-00369-KAD (D. Conn.).

6.      Detroit GRS will not accept any payment for serving as a representative party on behalf of the class beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this  18th  day of August, 2023.

**DAVID CETLINSKI**
Executive Director
General Retirement System of the City of Detroit

**Schedule A**

General Retirement System Of The City Of Detroit
Transactions in Verizon Communications, Inc.

| Ticker | Trade Date | Transaction | Number Shares | Price / Share |
|--------|-----------|-------------|---------------|---------------|
| VZ | 11/15/2018 | BUY | 2,754 | 59.0800 |
| VZ | 12/14/2018 | BUY | 95 | 56.9420 |
| VZ | 12/14/2018 | BUY | 249 | 57.3131 |
| VZ | 12/18/2018 | SELL | (12,800) | 55.6500 |
| VZ | 12/21/2018 | BUY | 200 | 54.9200 |
| VZ | 01/16/2019 | BUY | 159 | 57.0800 |
| VZ | 01/29/2019 | BUY | 4,998 | 53.5795 |
| VZ | 03/13/2019 | SELL | (2,186) | 57.6600 |
| VZ | 04/11/2019 | SELL | (6,272) | 58.4014 |
| VZ | 05/22/2019 | BUY | 197 | 59.1432 |
| VZ | 06/04/2019 | BUY | 200 | 56.2200 |
| VZ | 06/05/2019 | BUY | 701 | 57.0300 |
| VZ | 06/19/2019 | SELL | (2,167) | 57.6300 |
| VZ | 06/28/2019 | SELL | (100) | 57.1300 |
| VZ | 07/10/2019 | BUY | 50 | 57.0000 |
| VZ | 07/12/2019 | BUY | 283 | 57.1959 |
| VZ | 07/15/2019 | BUY | 284 | 57.6772 |
| VZ | 08/27/2019 | BUY | 79 | 57.4881 |
| VZ | 08/29/2019 | BUY | 979 | 57.4649 |
| VZ | 10/01/2019 | BUY | 200 | 59.9000 |
| VZ | 11/22/2019 | SELL | (15,607) | 59.7500 |
| VZ | 11/26/2019 | BUY | 7,167 | 59.4275 |
| VZ | 12/20/2019 | BUY | 211 | 62.0700 |
| VZ | 12/20/2019 | BUY | 7,553 | 61.7595 |
| VZ | 02/24/2020 | SELL | (3,403) | 57.9900 |
| VZ | 03/02/2020 | BUY | 128 | 56.6361 |
| VZ | 03/20/2020 | BUY | 184 | 51.8000 |
| VZ | 03/23/2020 | BUY | 225 | 50.3514 |
| VZ | 05/12/2020 | BUY | 85 | 55.6800 |
| VZ | 06/09/2020 | SELL | (2,261) | 57.4679 |
| VZ | 06/17/2020 | SELL | (1,079) | 56.6500 |
| VZ | 06/26/2020 | SELL | (227) | 53.1600 |
| VZ | 07/14/2020 | BUY | 1,877 | 55.4400 |
| VZ | 09/18/2020 | BUY | 71 | 60.3500 |
| VZ | 11/23/2020 | SELL | (757) | 60.2300 |
| VZ | 11/23/2020 | SELL | (1,797) | 60.2300 |
| VZ | 03/31/2021 | BUY | 9,620 | 58.5900 |

| Ticker | Trade Date | Transaction | Number Shares | Price / Share |
|---|---|---|---|---|
| VZ | 03/31/2021 | BUY | 191 | 58.1500 |
| VZ | 03/31/2021 | SELL | (9,620) | 58.5900 |
| VZ | 04/06/2021 | BUY | 63 | 58.9400 |
| VZ | 05/11/2021 | BUY | 51 | 58.5300 |
| VZ | 06/11/2021 | SELL | (26,172) | 57.1950 |
| VZ | 06/18/2021 | BUY | 380 | 55.8200 |
| VZ | 06/25/2021 | SELL | (179) | 56.3800 |
| VZ | 09/17/2021 | BUY | 734 | 54.2800 |
| VZ | 09/17/2021 | BUY | 56 | 54.2800 |
| VZ | 12/17/2021 | SELL | (1,362) | 53.1700 |
| VZ | 01/11/2022 | BUY | 4,666 | 53.5900 |
| VZ | 02/04/2022 | BUY | 208 | 53.5500 |
| VZ | 03/18/2022 | BUY | 150 | 50.8000 |
| VZ | 05/13/2022 | SELL | (2,362) | 48.1800 |
| VZ | 09/16/2022 | BUY | 2,715 | 41.2500 |
| VZ | 12/14/2022 | BUY | 143 | 37.4500 |
| VZ | 12/16/2022 | BUY | 2,983 | 37.1200 |
| VZ | 01/11/2023 | SELL | (1,179) | 41.1800 |
| VZ | 02/22/2023 | SELL | (535) | 39.2800 |
| VZ | 03/17/2023 | BUY | 3,272 | 36.7900 |
| VZ | 03/27/2023 | SELL | (1,147) | 38.0500 |
| VZ | 04/25/2023 | SELL | (540) | 37.3000 |
| VZ | 06/16/2023 | BUY | 4,220 | 36.4600 |